UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DIEGO ARMANDO MORALES JIMENEZ, | Case No. 3:25-cv-00570-MTK |
| Petitioner, | **OPINION & ORDER** |
| v. | |
| DREW BOSTOCK, Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO"); TODD LYONS, Acting Director of Immigration Customs Enforcement ("ICE"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, Secretary of the Department of Homeland Security ("DHS"); U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, Attorney General of the United States, | |
| Respondents. | |

**KASUBHAI,** United States District Judge:

Before the Court is Petitioner Diego Armando Morales Jimenez's Petition for Writ of Habeas Corpus. ECF No. 1. For the following reasons, the petition is granted.

## BACKGROUND

**I.     Petitioner Morales' Arrival, Release, and Supervision**

The Court finds the following facts to be true and without credible dispute. Petitioner was born on September 22, 1990, in the state of Aragua, Venezuela. Decl. of Diego Morales Jimenez

Page 1 —OPINION & ORDER

in Support of Temporary Restraining Order ("Morales Decl. I") ¶ 1, ECF No. 3-1. While in Venezuela, Petitioner "was active in peaceful political protests to support democracy, fair elections, and free speech." *Id.* ¶ 2. As a result, Petitioner was targeted by police and others associated with the Maduro regime in Venezuela, labeled a "traitor," and beaten and threatened at his home on multiple occasions. *Id.* Fearing for his life, Petitioner and his wife fled the country, seeking asylum in the United States. *Id.* ¶¶ 3-4.

On March 30, 2024, shortly after entering the United States, border patrol agents in El Paso, Texas detained Petitioner and charged him with inadmissibility under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act. Decl. of Stephen Grimm (Grimm Decl.) ¶¶ 8-9, ECF No. 19. Due to a lack of available bed space, Petitioner was released on his own recognizance on April 1, 2024, given an ankle monitor, and instructed to report to ICE in Portland, Oregon. *Id.*; Decl. in Supp. of Pet'r's Reply (Morales Decl. II) ¶ 2, ECF No. 23.

On April 8, 2024, Petitioner was directed to report to the Intensive Supervision Appearance Program (ISAP) office in Portland, Oregon. Morales Decl. II ¶¶ 4-5; Ex. B. Petitioner received a caseworker and was given a time and date for his next appointment. *Id.* ¶ 5; Ex. C. Petitioner reported again to the ISAP office on July 23, 2024. Morales Decl. II ¶ 6. In October 2024 and again in December 2024, Petitioner was questioned by ICE agents about whether he was a member of Tren de Aragua or any other gangs. Morales Decl. II ¶¶ 9, 12; Grimm Decl. ¶¶ 12-13. ICE officers asked Petitioner where he was from, and inspected and photographed Petitioner's tattoos. Morales Decl. II ¶¶ 9, 12. Petitioner's tattoos are pictured below and represent his children, two of whom were infant twins who died during childbirth. Morales Decl. I ¶ 15; Ex. F.





ICE took no action following either of these interviews, except that ICE removed Petitioner's ankle monitor following the October 2024 appointment. Morales Decl. II ¶¶ 10-11. Petitioner has since continued to comply with the conditions of his release. Morales Decl. I ¶ 9. When ICE removed his ankle monitor, Petitioner downloaded a cell phone application that tracks his location and that he uses to upload weekly photos and attend virtual or telephone interviews. *Id.*

## II. Invocation of the Alien Enemies Act

Upon his inauguration on January 20, 2025, President Trump issued several executive orders pertaining to immigration, including "Protecting the American People Against Invasion," which established a formal framework for mass deportations. 90 Fed. Reg. 8443. Less than two months later, on March 14, 2025, President Trump issued the Proclamation "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua" (the Proclamation). 90 Fed. Reg. 13033. The Proclamation invoked the Alien Enemies Act of 1798, stating: "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua], are within the United States and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* at 13034.

Five Venezuelan detainees subject to the Proclamation filed a class action suit seeking relief from the implementation of the Proclamation and their removal under it. *Trump v. J. G. G.*, 145 S. Ct. 1003, 1005 (2025). On March 15, 2025, the District Court for the District of Columbia issued two temporary restraining orders prohibiting the removal of the named plaintiffs as well as "[a]ll noncitizens in U.S. custody who are subject to" the Proclamation under the Alien Enemies Act. *Id*. Following an unsuccessful appeal for an emergency stay at the D.C. Circuit, the Trump Administration appealed to the Supreme Court. On April 7, 2025, the Court issued a decision vacating the temporary restraining orders, thereby allowing continued implementation of the Proclamation. *Id.* at 1006. The Supreme Court provided, however, that: "[Alien Enemies Act] detainees must receive notice after the date of this order that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.*

### III.     Petitioner's Detention and Petition for Writ of Habeas Corpus

On April 7, 2025, the same day the Supreme Court vacated the temporary restraining orders preventing detention and removal of Venezuelan citizens subject to the Proclamation, ICE ordered Petitioner to report in person on April 9, 2025. Morales Decl. II ¶ 13. The next day, April 8, 2025, Petitioner filed this Petition for a Writ of Habeas Corpus, alleging that ICE intended to detain him on April 9, 2025, regardless of the individual circumstances and facts particular to his case. Pet. ¶ 45, ECF No. 1.

Around 10 a.m. on April 9, 2025, Petitioner reported to the ICE office as instructed, accompanied by his wife and his attorney. Grimm Decl. ¶ 14; Decl. of Nelly P. Garcia Orjuela ("Garcia Decl.") ¶ 2, ECF No. 24. A few minutes after Petitioner provided his documentation at the waiting room window, two officers approached him and asked him to come with them. Garcia Decl. ¶ 3. One of the officers—Special Agent Stephen Grimm from Homeland Security Investigations—informed Petitioner's counsel that "[Petitioner] was being arrested." *Id*. ¶ 4. Special Agent Grimm explained that Petitioner "was being arrested to do a custody re-determination based on his initial charges." *Id.* When Petitioner's counsel followed up to determine what these charges were, Special Agent Grimm responded that "[Petitioner] is on a list." *Id.*

At 10:49 a.m. on April 9, 2025, this Court entered an order prohibiting Respondents from removing Petitioner from the State of Oregon until the Petition was resolved or the order lifted. ECF No. 4.[1] The same afternoon, at Respondents' request, this Court held an emergency hearing

---

[1] At almost the same time, Petitioner filed a Motion for Temporary Restraining Order requesting the same relief the Court had already ordered. ECF No. 3. Based upon Petitioner's representation of intent to withdraw the motion in light of the Court's order, the Motion for Temporary Restraining Order was denied without prejudice. ECF No. 10.

via telephone to determine whether Petitioner could be transported to Tacoma, Washington. ECF No. 9. ICE does not have a facility to house detainees overnight in Oregon, so ICE typically transports detainees to its facility in Tacoma. Grimm Decl. ¶ 16. The Court denied Respondents' request, and Petitioner was therefore released the same day under his prior conditions of release. ECF No. 9; Grimm Decl. ¶¶ 16-17. As of the most recent information in the Court docket, Petitioner has attended all his virtual appointments and calls and has submitted his weekly photograph through the phone application during the pendency of this Petition. Morales Decl. II ¶ 15.

ICE has subsequently determined that Petitioner is not subject to the Proclamation. Grimm Decl. ¶18. Petitioner's immigration proceedings remain pending before the Portland Immigration Court, with his first appearance scheduled for June 23, 2026. Morales Decl. I ¶ 11.

## DISCUSSION

Under 28 U.S.C. § 2241(c)(3), federal courts have jurisdiction over petitions for writs of habeas corpus filed by persons "in custody in violation of the Constitution or laws or treaties of the United States." Petitioner here alleges that Respondents' revocation of his release violates the Administrative Procedure Act (APA) and Petitioner's right to procedural Due Process under the Fifth Amendment. Respondents contend that this Court lacks jurisdiction over Petitioner's claim because (1) the Petition is directed at "conditions" of his confinement rather than "validity" of confinement, and (2) there is no final agency action as necessary to obtain judicial review under the APA. The Court begins by addressing Respondents' threshold jurisdictional challenges and, finding them unavailing, proceeds to address the merits of the Petition.

IV.    **Jurisdiction**

    A.    **Validity of Confinement versus Conditions of Confinement**

Respondents first contend that this Court lacks jurisdiction because Petitioner does not challenge the validity of his confinement. In the Ninth Circuit, "the writ of habeas corpus is limited to attacks upon the legality or duration of confinement and does not cover claims based on allegations that the terms and conditions of incarceration constitute cruel and unusual punishment." *Pinson v. Carvajal*, 69 F.4th 1059 (9th Cir. 2023) (citation modified). According to Respondents, Petitioner "is seeking to dictate the conditions of confinement: If he is detained, he does not want to be confined in a facility outside the District of Oregon." Resp. 14, ECF No. 18.

The Supreme Court recently made clear that "claims for relief [that] necessarily imply the invalidity of . . . confinement and removal . . . fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Trump v. J. G. G.*, 145 S. Ct. at 1005. Here, Petitioner alleges that the revocation of his release from custody without an individualized determination—made by an authorized official—that he is a danger to the community or a flight risk violated the APA and his right to procedural Due Process under the Fifth Amendment. Pet. ¶¶ 51-53, 58-59. These claims for relief, which are focused on statutory and regulatory provisions relating to *custody* decisions, squarely address the validity of Petitioner's confinement in the first place, not the conditions of it.

Respondents' argument appears to arise from several lines in the Petition that address transfer out of the District of Oregon, particularly in the Prayer for Relief. Respondents' framing of the issues is myopically selective. A review of all the Claims for Relief, including the legal basis for them, squarely relate to the validity of Petitioner's confinement. That Petitioner prays for additional relief beyond the custody issue does not change the fact that the crux of the Petition is that the revocation of his release violated the law.

B.	Final Agency Action

Respondents next argue that this Court lacks jurisdiction because Petitioner is not challenging a "final agency action" as required to obtain review under the APA. The APA provides: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The requirement of "final agency action" effectively codified the doctrine of exhaustion of administrative remedies in the APA. *Darby v. Cisneros*, 509 U.S. 137, 146, 153-54 (1993). An agency action is "final" for purposes of the APA when "[i]t marks the consummation of the agency's decisionmaking process" and is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted).

As an initial matter, the Court notes that this argument only applies to the claims which invoke the APA (Counts One and Two), not to Petitioner's Fifth Amendment Due Process claim (Count Three). There is no "final agency action" requirement for a Fifth Amendment Due Process claim, and Respondents offer no legal basis for any similar argument to apply in the context of that claim. Thus, the question before the Court is whether the Court lacks jurisdiction to address Counts One and Two due to an alleged lack of final agency action.

Respondents contend that there is no final agency action in this case because Petitioner could challenge his rearrest before an immigration judge and then appeal to the Board of Immigration Appeals. By failing to avail himself of those steps, Respondents argue that Petitioner has not exhausted his administrative remedies and that the agency action is therefore not final. Petitioner argues (1) that the Court's jurisdiction is based in habeas, not the APA, and final agency action is therefore not required for this Court to assert jurisdiction; and (2) that there is final agency action because pursuit of the immigration court review process would be futile.

Regardless of whether this issue is a jurisdictional question, the Court agrees that exhaustion in the manner Respondents urge would be futile. Finality must be interpreted "in a pragmatic way" and must take into account "the effect of the action." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985 (9th Cir. 2006). Further, "[f]utility is among the exceptional circumstances when exhaustion of administrative remedies is not required." *Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, 819 F. App'x 480, 482 (9th Cir. 2020). "Exhaustion is futile where continuing administrative proceedings would clearly be of no avail, . . . where there is "certainty of an adverse decision," . . . or where there is "undisputed evidence of administrative bias." *Id.*

In this case, Petitioner was to be transported to the Northwest Detention Center in Tacoma, Washington. But, "[b]eginning around November 2022, the Tacoma Immigration Court started denying bond hearings for noncitizens 'who entered without inspection and who have since resided in the United States.'" *Rodriguez v. Bostock*, 2025 WL 1193850, at *4 (W.D. Wash. Apr. 24, 2025). At oral argument, Respondents did not dispute this fact, instead arguing that the bond hearing issue was being considered in a separate class action proceeding. But the legality of the Tacoma Immigration Court's conduct regarding bond hearings is not the question before the Court here, and Respondents present no explanation of its relevance to the Court's analysis of futility in the context of determining "final agency action" necessary for the APA claims here. It is hard to imagine a situation more futile than the complete unavailability of further review. Because the Court finds that further administrative process is unavailable to Petitioner, Respondents' revocation of Petitioner's release from custody is final agency action for purposes of his APA claims.

V.    **Merits**

As noted above, Petitioner states three claims as to the unlawfulness of Respondents' revocation of Petitioner's release. The Court notes that Respondents did not provide any argument or evidence to dispute the merits of Petitioner's claim. Although Respondents stopped short of conceding the merits, they did acknowledge that their "fortunes probably rise or fall on jurisdiction." May 13, 2025, Oral Argument Transcript at 39:1-4, ECF No. 26. For the following reasons, the Court finds in favor of Petitioner on all three claims for relief.

    A.    **Counts One and Two: Violations of the APA**

Under the APA, Courts must:

> hold unlawful and set aside agency action, findings, and conclusions found to be:
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). Here, Petitioner contends that his arrest on April 9, 2025, constituted a revocation of his release that was not authorized by law, in excess of statutory authority, and an abuse of discretion. Pet. ¶¶ 51-53, 57-59. Petitioner's argument relies on 8 U.S.C. § 1226(b) and 8 C.F.R. 1236.1(c)(9).

Under 8 U.S.C. § 1226(a), "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." The individual may remain detained or may be released on bond or conditional parole. *Id.* For individuals released on bond or

conditional parole, the Attorney General "at any time may revoke a bond or parole . . . rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. 1226(b).

    1.  <u>Count One</u>

In Count One, Petitioner contends that Respondents' decision to re-detain him was an abuse of discretion because it was not based on an individualized determination of his danger or flight risk. Rather, Petitioner was arrested because of his inclusion on "a list." Petitioner contends that he was included on that list based on Respondents' categorical determination that any men from the state of Aragua in Venezuela who have tattoos are connected to Tren de Aragua and subject to the Alien Enemies Act.

While there is no direct evidence as to the nature of the "list," the facts here provide a strong basis to infer that Petitioner's contention is accurate because Petitioner received the call to report to ICE the very same day the Supreme Court vacated the temporary restraining orders against detention and removal under the Alien Enemies Act. The Court finds it alarming, to say the least, if Petitioner were included on "a list" of individuals subject to the Alien Enemies Act simply because of his country, state of origin, and tattoos, without any consideration of his individual circumstances. The Court cannot comprehend a scenario, especially in a record devoid of competing evidence, where a tattoo commemorating Petitioner's two deceased infant twins could be interpreted as gang related. Respondents' reliance on "a list" to rationalize individuals' removal, without any credible evidence to support gang affiliation in this case, is deeply flawed and reeks of pretext.

Regardless of the disturbing nature of the inferences easily drawn from Special Agent Grimm's references to "a list" and the timing of Petitioner's detainment, Respondents' failure to provide any evidence on the merits of Count One of Petitioner's Complaint is sufficient to resolve this claim.

Agency action is "arbitrary and capricious" and in violation of the APA where the agency fails to provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). Here, Respondents provided no explanation at all, let alone a "satisfactory" one. Instead, the undisputed facts in the record support that Respondents made no individualized determination as to Petitioner's flight risk and danger to the community. While Petitioner was twice questioned about any connection to Tren De Aragua, no action was taken at that time to revoke his release. Indeed, after his first interview on the subject of gang membership, ICE removed his ankle monitor. Nothing in the record suggests that anything about his circumstances have changed since Petitioner was released on his own recognizance, and Respondents offer no evidence or argument to the contrary. Accordingly, Respondents' revocation of Petitioner's release was arbitrary and capricious and in violation of the APA. The Court finds in favor of Petitioner on Count One of his Petition.

2. Count Two

In Count Two, Petitioner contends that Respondents' revocation of his release from custody was "not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations;" or "without observance of procedure required by law" and therefore violates the APA. Pet. ¶¶ 55-59, citing 5 U.S.C. § 706(2)(A)-(D). Petitioner's claim relies on Respondents' alleged violation of the following regulation:

> When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained.

8 C.F.R. § 1236.1(c)(9).

The Court agrees that the record supports Respondents' violation of the APA. The regulation at issue contains a list of individuals authorized to revoke an individual's release under 8 U.S.C. 1226(a). There is no evidence here that the decision to revoke Petitioner's release was made by any of the individuals listed in the regulation. Instead, Petitioner was arrested due to his inclusion on "a list" created by unknown individuals. Such action is contrary to 8 C.F.R. 1236.1(c)(9) and therefore in violation of the APA. *See* 5 U.S.C. § 706(2)(A)-(D). The Court finds in favor of Petitioner on Count Two.

### B.    Count Three: Violation of Procedural Right to Due Process

Petitioner's third and final claim alleges that Respondents' actions violated his Constitutional right to procedural Due Process by revoking his release arbitrarily and without an individualized determination of his danger to the community or flight risk. Pet. ¶¶ 60-64. The Ninth Circuit has explained that analyzing a procedural Due Process claim involves a two-step inquiry. *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir. 2012). "[T]he first [step] asks whether there exists a liberty or property interest which has been interfered with by the State; the second [step] examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (internal quotation marks and citations omitted). The second step is evaluated based on the test set forth in *Mathews v. Eldridge*, which instructs courts consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail

424 U.S. 319, 335 (1976); *see also Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013) (explaining that the second step of the procedural Due Process inquiry is governed by the *Mathews v. Eldridge* framework).

Petitioner easily satisfies the first step here because "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690. And the Due Process Clause applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693; *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often on others.") (quotations omitted).

At the second step, the Court finds that the *Mathews* test is satisfied. On the first *Mathews* factor, Petitioner's private interest in freedom from imprisonment is strong for the reasons mentioned above: freedom from government custody is fundamental. That is even more true here because, at the time of Petitioner's detention, his wife was six months pregnant. Morales Decl. I ¶ 1. The second two *Mathews* factors likewise favor Petitioner for the same reasons discussed in Section V.A.1 of this opinion: Petitioner only asks for Respondents to follow the procedural safeguards already in place in applicable statutes and regulations. Revoking release without making an individual determination as to whether such revocation is warranted carries a high risk of erroneous deprivation of liberty, and Respondents could hardly argue that compliance with existing laws would be overly burdensome. Indeed, Respondents have provided no argument or evidence whatsoever. Accordingly, the Court finds that Respondents violated Petitioner's Fifth Amendment right to Due Process and finds in his favor on Count Three.

## CONCLUSION

The Court finds that the revocation of Petitioner's release from custody was unlawful based on all three of Petitioner's claims for relief. Petitioner's Petition for Writ of Habeas Corpus (ECF No. 1) is GRANTED. The Court ORDERS the following relief:

- Respondents shall not detain Petitioner unless an authorized official makes an individualized finding of probable cause that Petitioner is a flight risk or a danger to the community.

- If Petitioner is detained, Respondents shall not physically remove Petitioner from the District of Oregon unless they provide him with 30 days notice of their intent to do so.

- Respondents shall provide Petitioner with 30 days notice if Respondents determine that Petitioner is subject to removal under the Alien Enemies Act.

DATED this 22nd day of August 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge
